By the Court, Bronson, J.
If the principal witness must be understood as swearing to an unconditional promise of marriage, there is nothing in the case which tends in the slightest degree to corroborate her testimony. So far as appears, no one else had ever known or heard of any intimacy between the par *447 ties, or that the defendant had ever paid any marked attentions to the plaintiff. No one but the sister—not even the other members of the family, nor any of the family connections—seem to have either Imown or suspected that there was an engagement of any kind between the parties. The attempt which the plaintiff made to show facts from which a promise might be inferred, or which would tend to confirm the direct evidence of a promise, wholly failed. It is unusual, to say the least, that an engagement of this kind should exist for nearly two years and a half, between persons residing in the same country village, without any such manifestation of partiality on the part of the gentleman as to induce a suspicion among either neighbors or friends that a marriage was in contemplation. In addition to this, the notes which were written by the plaintiff to the defendant, and the non-production of his answers, if any were given, furnish reasons for the belief that the anxious and tender feelings which were manifested by the lady were not reciprocated by the gentleman; and these, with several other facts which appear in the case, tend strongly to the conclusion that neither of the parties supposed there was any engagement between them. Still the credibility of the principal witness was a question for the jury. And although she did not hear the' conversations of which she speaks under the most favorable circumstances for arriving at an accurate knowledge of how much was intended by the parties ; and although she had made' memoranda, and recited the conversations in a way which induced a suspicion on the part of the counsel that her story had been prepared for the occasion; it still belonged to the jury to say with how many grains of allowance her testimony should be received. The defendant’s counsel asked too much, therefore, when they requested the judge to tell the jury that her testimony ought to be wholly disregarded. It is sometimes proper— and it would have been well enough in this case—for the judge to lay down certain rules or principles for the guidance of the jury in passing upon the credibility of a witness. But the counsel made no such request; and it cannot often be proper for the *448 judge to tell the jury that they are not at liberty to believe a witness.(a)
The second letter written by the plaintiff’s brother, Vincent Conrad, can only be regarded as the act of a third person, for which the plaintiff was not responsible. There is no evidence that she approved of it, or even knew that such a letter had been written. It is said that the letter should have been received by way of impeaching the testimony which had been given by the writer. But I do not see that it could amount to an impeachment. The letter was written after the defendant’s marriage," and it speaks of a conditional promise to marry the plaintiff, or to marry her if he ever married at all. But the writer had said nothing in his testimony about an unconditional promise. Indeed, no such thing seems to have been thought of by any one until about the time the suit was commenced. I do not see that there was any error in rejecting this evidence.
It is next said, that the verdict is against evidence—that there was no proof of an unconditional promise of marriage. It has already been remarked, that there is nothing from which a promise of marriage can be inferred. The case - turns wholly upon the direct evidence of a promise, given by a single witness, without the aid of any collateral fact to support her testimony. Many of the collateral facts tend to the conclusion that there was no engagement of any kind between the parties. But the jury have passed upon the credibility of the witness, and I shall assume that she has related truly what she overheard while listening to the conversations of the parties. She does not pretend to have heard all, or any considerable portion, of what passed in either of the conversations; and it is quite possible that she may have heard the parties speak of marriage, when, if we had the whole conversation, it would be evident that neither of them had any settled purpose of contracting that relation. But if nothing had been said beyond what the witness has related, I do not see how it would be possible to uphold the *449 verdict. I do not intend to say that there was no evidence which would warrant the jury in finding a promise of some kind ; but only that there was no sufficient ground for finding any of the promises upon which the plaintiff has counted. Without detailing the conversations particularly, it will be sufficient to say, that they were of an equivocal character, and to show ' how they were understood by the witness, and by the plaintiff herself. The last conversation was in October, 1841, when the plaintiff, according to the testimony of the witness, said among other things, “ there is no certainty about my getting married ; but I wont say I never will. She [the plaintiff] said, íh’. Williams, shall I still consider myself engaged to you, if you ever do get married 7 He said, yes.” After the plaintiff •was taken with the strange spasms, about a fortnight before the marriage, the defendant was sent for and went to the house, where he had not before been for the last, nine months, except that he had called there a short time one evening, eight months before, at a party. The sister testifies that when the defendant went to the bed, the plaintiff said, “ Mr. Williams, didn’t you tell me you would marry me when you married any one 7 He said he did; but it was only to calm her feelings. She said, I knew you told me so; but I did not know what you told me so for.” On the cross examination, the witness gave the conversation in this way—“ Mary said, did you not tell me if you married any one you would marry me? He said he had.” The family then sent for the defendant’s brother, Timothy; and the sister testified that she told him, the defendant “ had said he would marry Mary whenever he got married.” Timothy testified that when sent for he went, and had a conversation with the plaintiff and her sister Frances. He added: “Mary stated that my brother had not done with her as he agreed. She said he had told her he never intended to marry any body. That when she told him he would perhaps change his mind, he told her he would let her know if he did. She said he added still further, that if he ever married, he would come and take her. I think these were the words, or very near the words. Fanny was present and asserted the same thing, and said *450 she had heard him say so. She said he told Mary if he ever got married he would come and take her. That he said he never intended to marry any one: that she could not depend on him. I understood both Fanny and Mary to say so. No other promise was mentioned as I recollect.” The witness called again the next day, when Fanny and Mary “ both reiterated what was said the evening before.” Four or five days after-wards, and after the plaintiff’s brother Vincent had had ample time to inform himself of whatever the family knew or felt on the subject, he wrote the plaintiff a letter bearing date the 5th of September, 1842—two days before the marriage—which he testified, was written “with an understanding with Mary.” In this letter the brother said—“This communication is made, partly by request of sister Mary, and partly on my own account, to inform you what we shall require of you in order to the friendly arrangement of the unfortunate affair now existing between us. My sister directs me to say, that she will require you to fulfil the solemn engagement made with her, which was substantially this ; that if you ever married, you would marry her. This engagement, if faithfully kept on your part, although it does not bind you to marry, will nevertheless compel you to abandon entirely your intended marriage with another, which you have acknowledged is soon to take place. This, my sister as well as myself, insist upon your doing, and is all that she at present requires.” Then followed a requirement that the defendant should make an apology to the brother, with a threat in case the defendant refused to comply with these terms. The defendant answered the letter; but the plaintiff did not produce the answer.
Whatever inference might be drawn from any or all of the five conversations which were overheard by Frances, if they stood unexplained, both the plaintiff and her witness—and I may add, the whole family, so far as they profess to know any thing about the matter—are fully committed in relation to the nature and extent of the alleged promise. They have told us how the conversations were understood by them; and this has been done on occasions and under circumstances when they *451 were disposed to make the very worst case they could against the defendant. Taking their own account of the matter, there never was an unconditional promise to marry the plaintiff. At the most the promise was, not to marry any one else; or to marry the plaintiff if he married any one. This was the charge brought against the defendant when he was sent for; and it was repeated to his brother on the two following days. And after the family had taken further time for deliberation, the accusation was set forth in a formal written document, which was the joint act of the plaintiff and her brother, and contained the terms on which the matter might be arranged. There was no pretence of any thing more than a conditional engagement, and it was expressly admitted that it was such an one as did not bind the defendant to marry the plaintiff, hut only to relinquish the purpose of marrying another lady. Now, upon such a state of facts, the jury was not at liberty to find an unconditional promise. There are other facts in the case which strongly tend to the conclusion that injustice has been done to the defendant; but this is enough. We do not very often c isturb the verdict of a jury on the ground that it is against evidence; but if it should not be done in a case like this, there is reason to fear that the trial by jury would soon cease to be a blessing, and fall into discredit with the people.
It has not been contended that an action would lie upon such a promise as has been mentioned. It was, in effect, a promise in restraint of marriage. But it is enough to say, that the plaintiff has not counted upon any such promise as that which was proved.
Although the verdict must be set aside without any reference • to the facts disclosed by the affidavits, I am glad that the affidavits have been laid before us, because they have relieved my mind from the apprehension that the jury had been carried away by prejudice, partiality, or passion. It appears from the case that at the close of the charge the judge was requested by the defendant’s counsel to instruct the jury that the action could *452 not be sustained on such a conditional promise as has been mentioned; and the judge told the jury that such was the law. Every one of the jurors has made affidavit that although he noticed that something passed between the counsel and the judge at the close of the charge, yet, owing to the great noise and confusion which then prevailed in the house, he did not hear what was said by either. This explains how it happened that the jury found a verdict which was not warranted by the evidence before them.
I must not dismiss this case without a further remark upon what appears in the affidavits. Although there is a conflict in the statements upon some points, it is impossible to read the affidavits without the painful apprehension that popular feeling was brought to bear upon the administration of justice. Some portion of the applause which a part of the audience bestowed upon the plaintiff’s counsel was probably intended for the jury; and there was a want of that order and decorum which should always prevail in courts of justice. It is not to be tolerated that men should go into such a place and manifest their feelings, prejudices or passions, for the purpose of exerting an influence upon those who sit in judgment upon the rights of parties. Although some of the witnesses say that there was not much disturbance in the house, we have the remarkable fact, proved beyond the possibility of contradiction, that in consequence of the noise and confusion which prevailed, not one word of the most important part of the charge was heard by a single juror. 1 call it the most important part of the charge, for the reason that if the jurors had heard and followed it, they could not .have found the verdict which was rendered. There were collateral facts in the case which were calculated to awaken sympathy for the plaintiff, and excite prejudices against the defendant. In such a case, more than usual pains should be taken to guard the jury against being carried away from the main points of the controversy. But I will not pursue the subject. What would be our duty if the case stood wholly upon the affidavits need not be considered; for whether we open them or not, it is clear *453 that there must he a new trial. But as there was no error in the ruling of the judge upon any point of law, it must be on payment of costs.
Ordered accordingly.

 The case of Dunlap v. Patterson, (5 Cowen, 243,) furnishes an instance where the judge may thus interfere.